# Exhibit A

Filed
D.C. Superior Court
03/14/2022 18:14PM
Clerk of the Court

# Superior Court of the District of Columbia

## CIVIL DIVISION- CIVIL ACTIONS BRANCH

### INFORMATION SHEET

James Nides

vs

Nuture Inc

Case Number: None yet

Date: 3/14/22

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: (Please Print)<br>Thomas C Willcox | Relationship to Lawsuit |
| Firm Name:<br>Thomas C. Willcox, Attorney | ☒ Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.:<br>202 617 4210          445135 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:   ☐ Non-Jury   ☒ 6 Person Jury        ☐ 12 Person Jury

Demand: $__          Other: Equitable relief

PENDING CASE(S) RELATED TO THE ACTION BEING FILED          in excess of $10,000

Case No.:_____   Judge: _____   Calendar #._____

Case No.:_____   Judge: _____   Calendar#:_____

---

**NATURE OF SUIT:** *(Check One Box Only)*

**A. CONTRACTS**          **COLLECTION CASES**

| | | |
|---|---|---|
| ☒ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☒ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property |    Over $25,000 Pltf. Grants Consent |    Over $25,000 Consent Denied |
| ☐ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees |    Under $25,000 Pltf. Grants Consent |    Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration | |
| |    Award (Collection Cases Only) | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 20 Friendly Suit |
| ☐ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, Not Malpractice) | ☐ 23 Tobacco |
| ☐ 08 Fraud | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015



**Superior Court of the District of Columbia**
CIVIL DIVISION
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Jim Nides,
_____
Plaintiff

vs.

Case Number :_____

Nurture, Inc.
1 Maple Avenue,
White Plains, New York.
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Thomas C. Willcox
_____
Name of Plaintiff's Attorney

1701 16th Street, NW #211
_____
Address
Washington DC 20009
_____

202.239.2642
_____

*Clerk of the Court*

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시요           የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

Jim Nides
_____
                               Demandante

                    contra                          Número de Caso: _____

Nurture, Inc.
1 Maple Avenue,
White Plains, New York.
                                    Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Thomas C. Willcox
_____                    *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

1701 16th Street, NW, #211
_____        Por: _____
Dirección
Washington DC  20009                                          Subsecretario
_____

202.239.2642
_____        Fecha _____
Teléfono

如需翻译, 请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
한국어로 번역을 원하시면 (202) 879-4828 로 연락하십시오.       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D.  REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

3/14/21
_____
Date

CV-496/ June 2015

DISTRICT OF COLUMBIA SUPERIOR COURT
Civil Division

Jim Nides                                    Jury Trial Demanded
1701 16th Street, N.W.
Apt 522
Washington, DC.   20009
Representative Plaintiff
On Behalf of the DC General Public

v.
Nurture, Inc.
1 Maple Avenue,
White Plains, New York.

     Defendant

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jim Nides ("Plaintiff"), by and through counsel, brings this action against the

defendant named above on behalf of the General Public of the District of Columbia (the

"General Public"), and alleges the following based upon information, belief and the investigation

of counsel:

**NATURE OF CASE`**

1.  This is a representative action brought on behalf of Plaintiff and the DC General
    Public who purchased Defendant's baby foods.

2.  The Defendant manufactures and markets purportedly "organic" and/baby food that, in
    fact, contained harmful levels of heavy metals, including arsenic, mercury, cadmium,
    and lead. As a recent congressional report found the Defendant's baby food products
    contain significant levels of toxic heavy metals, which can endanger infant
    neurological development.

3.  Not knowing that this baby food—billed as "organic" — contained these harmful
    ingredients, the General Public of DC bought the defendant's baby food to feed their

1

infants. If the General Public had known that these baby foods contained these dangerous ingredients, they would not have purchased them to feed their infant children. Because Defendant misrepresented the true nature of the ingredients in its baby food when it failed to disclose the presence or risk of dangerous levels of heavy metals, the Plaintiff brings this action, individually and on behalf of the DC General Public, against the Defendant for breach of express and implied warranties, and violation of the consumer protection laws.

4. To date, the most vigorous response of the Defendant and other baby food manufacturers has been to form a trade organization whose purported purpose was to establish proper safety standards for levels of heavy metals in their products. To date, the organization in question has done little more than issue some press releases and set issue a list of laboratories that meet certification standards for testing food products for, inter alia, heavy metals.

5. The DC General Public accordingly suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth herein, and seek appropriate relief.

6. The Plaintiff seeks to enjoin such fraud, obtain damages on behalf of the Plaintiff, and obtain an injunction on behalf of the DC General Public against further such conduct in the District of Columbia.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over this action, and venue is appropriate in this Court, pursuant to D.C. Code §§ 11-921 and 28-3905(k)(1).

2

8.  This Court has personal jurisdiction over the Defendant pursuant to D.C. Code §13-423, as Defendant sells its products at stores throughout Washington, D.C., and derives substantial revenues therefrom.

9.  In addition, a substantial part of the actions which gave rise to the cause of action at issue occurred in this jurisdiction,

**THE PARTIES**

10. Plaintiff Jim Nides is a resident of the District of Columbia.

11. Defendant Nurture Inc ("Nurture" or the "Defendant") is incorporated in Delaware. Its headquarters and principal place of business is located at 1 Maple Avenue, White Plains, New York.

12. At all relevant times, Nurture has derived substantial revenue from its sale of baby foods within the District of Columbia.

**LEGAL FRAMEWORK - THE INTERESTS OF THE DC GENERAL PUBLIC MEMBERS AND THE GENERAL PUBLIC AND THE DC CONSUMER PROTECTION**

13. The District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq.,* prohibits unlawful trade practices.  The prohibited trade practices include, in relevant part, actions that

(a)  represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

 (b). represent that goods have characteristics, uses, or benefits that they do not have;

  (d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e) misrepresent as to a material fact which has a tendency to mislead;

(f) fail to state a material fact if such failure tends to mislead;

(f-1), use innuendo or ambiguity as to a material fact, which has a tendency to mislead

(h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered; and

(x) to sell consumer goods in a condition or manner not consistent with that warranted by operation of sections 28:2-312 through 318 of the District of Columbia Code, Official Code, or by operation or requirement of federal law.

Section 3904.

14. Additionally, "the CPPA's extensive enforcement mechanisms apply not only to the unlawful trade practices proscribed by § 3904, but [also] to all other statutory and common law prohibitions." *Osbourne v. Capital City Mortgage Corp.*, 727 A.2d 322, 325-26 (D.C. 1999).

15. Prior to 2000, only a "consumer" could bring a private action under the CPPA. However, in 2000, the City Council amended the CPPA to allow a "person" to bring an action on behalf of the general public of the District of Columbia.

16. The CPPA such a "Representative Action" to seek, as forth in more detail below, numerous remedies on behalf of the general public of the District of Columbia, D.C. Code § 28-3905(k)(1).

17. Plaintiff brings this action on behalf of himself and as a Representative acting for the interests of the general public of the District of Columbia, seeking relief from Defendant's use of trade practices in violation of laws of the District of Columbia, pursuant to D.C. Code § 28-3905(k)(1).

18. The defendant's product as described herein is a "consumer good", and the defendant is a "merchant" within the meaning of the CPPA. D.C. Code § 28-3901(1)(2) and (7).

I.   THE NIDES PURCHASE

19. On November 19th, 2021, Plaintiff purchased two of the Defendant's products, Organic "Strawberry and Beet Puffs" and Organic "Strawberry". A copy of the receipt, and photos of the product packaging are set forth infra.

*Figure 1*

Figure 2



Figure 3



Figure 4



*Figure 5*



*Figure 6*



Figure 7



20. Under the CPPA, such purchases are all that is necessary to give Mr. Nides standing to

be the Representative in this action. D.C. Code § 28-3905(k) (2001) (whose 2000

amendments replaced the word "consumer" with "person") and now specifies

(k)(1) An individual may, on behalf of that individual, or on behalf of both
the individual and the general public, bring an action seeking relief from the
use of a trade practice in violation of a law of the District when that trade
practice involves consumer goods or services that the individual purchased
or received in order to test or evaluate qualities pertaining to use for personal,
household, or family purposes

21. The remedies available include:

(A) treble damages, or $1,500 per violation, whichever is greater,
payable to the consumer;
(B) reasonable attorney's fees;
(C) punitive damages;
(D) an injunction against the use of the unlawful trade practice;
(E) in representative actions, additional relief as may be necessary
to restore to the consumer money or property, real or personal,
which may have been acquired by means of the unlawful trade
practice; or
(F) any other relief which the court deems proper.

22. The basis for Mr. Nide's standing and the manifestation of his alleged injury in fact is

similar to that in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 371 (1982).

23. In *Havens*, a national housing rights organization had a black applicant and a white

applicant submit identical resumes to an apartment complex for housing.  The purpose

of the applications was not to obtain housing; instead, the purpose was to determine

whether or not the apartment complex was engaged in racial discrimination.   The

housing complex approved the application of the white applicant, but denied the

application of the black applicant.

24. The *Havens* court held that the black application had standing to sue for damages,

<u>even though he never had any intention of moving into the apartment</u>.

12

25. There, the Court determined that § 804(d) of the Fair Housing Act "established an enforceable right to truthful information concerning the availability of housing," id. at 373, 102 S.Ct. 1114, and thus, plaintiffs were injured in fact and had standing to sue because of "deprivation of information about housing availability."

26. In *Molovinsky v. Fair Employment Council*, 683 A.2d 142 (1996), the DC Court of Appeals upheld the theory of tester liability.  In *Molovinsky*, in response to complaints that a prospective employer, Executive Suites, was violating the rights of a Mr. Henderson by harassing him during a job application violating Mr. Henderson's rights under DC law, the DC Fair Employment Commission designed a gender discrimination program and arranged four testers, two men and a woman to pose as job seekers and visit Executive Suite.  *Id* at 145.

27. As each tester had the same experience as Mr. Molovinsky, the FEC sued Executive Suites, alleging violation of the employment laws. The jury awarded damages verdicts, including punitives, for not just Mr. Henderson, but also the individual testers. *Id* at 145.

28. Citing *Havens*, the DC Court of Appeals upheld the standing of the plaintiffs to bring suit, even though they had engaged in the interviews <u>for the sole purpose of determining whether unlawful activity was taking place</u>.

29. Consistent with the above case law, the legislative history of the CPPA's 2000 amendments creating Representative Actions makes it clear that reliance is not required

30. According to the 2012 DCCPPA Amendment Committee Report (the "Report"), "tester standing" was created to allow consumers who offer to purchase, or actually

purchase, products or services with the intent of determining whether those products or services are what they claim to be, to file suits against untruthful merchants. See D.C. Council, Report on Bill 19-0581 at 4-5 (November 28, 2012). The Report states that "consumers need not actually have been misled by a misrepresentation regarding a consumer good or service to have suffered an injury-in-fact giving rise to an actionable claim." *Id* at 4. The Report further states that "[l]ike the testers in *Havens* and *Molovinsky*, D.C. consumers must be allowed to offer to purchase, or actually purchase, products or services with the intent of determining whether those products or services are what they claim to be." *Id* at 5.

31. Consistent with the above precedent, in *Grayson v. AT & T Corp.*, 15 A. 3d 219 (DC 2011), a former employee of a telecommunications firm was aware that the firm was failing to escheat unused funds on prepaid telephone calling cards to the District of Columbia, as required by law. *Id* at 249-252.

32. In order to have standing to sue the company to cease this practice (again, with full awareness the product was 'defective", and with no intention of using the product), the *Grayson* plaintiff purchased such telecommunications card. *Id.*

33. The DC Court of Appeals, invoking the *Havens* ruling, upheld the standing of said purchaser of prepaid telephone calling card to sue for alleged violations of the CPPA. Consistent with *Havens*, the Supreme Court ruled as such even though, as noted above, the plaintiff was an industry insider who knew when he purchased the product that it had the defects at issue. *Id.*

34. Further, the DC City Council had suspended funding of enforcement by the DC Attorney General's Office of the CPPPA. *Id* at 240.

35. Therefore, the liberal standing requirements conferred by *Grayson* on private plaintiffs are consistent with the intent of the DC City Council to "provide public interest organizations and private attorneys the ability to seek injunctive relief and disgorgement of ill-gotten gains in the public interest". *Id* at 240.

36. Post *Grayson* case law has largely followed its mandate. *See Julian Ford v. ChartOne, Inc.*, 908 A.2d 72, 83 (D.C. 2006) (holding that the definition of consumer transaction under D.C. Code § 28-3901(a)(7) includes "consumer purchases of business opportunities, <u>and purchase of medical records for a lawsuit qualifies as purchasing a business opportunity</u>") (emphasis added) *accord*, *Mostofi v. Mohtaram, Inc.*, 2013 D.C. Super. LEXIS 12 (November 12, 2013), in which a resident of Maryland bringing a CPPA §3905(k)(1) action bypassed supermarkets in Maryland to purchase Superior Court of the District of Columbia was held to have standing "to test whether that EVOO was "true extra virgin olive oil"), with the court noting:

> Ultimately, neither the intent of Plaintiff nor whether he 'manufactured' standing are dispositive of the question. No precedent establishes that the Court must apply a 'good faith' standard to the actions of a plaintiff in order to find that the standing requirement has been met. Further, Plaintiff . . . does not need to demonstrate that he suffered any physical, emotional, or monetary injury; an actual or immediate statutory violation is sufficient to establish an injury-in-fact. . . . The motivations of the plaintiff in *Julian Ford* are similar to Plaintiff; both bought a good for the purpose of advancing litigation. <u>At the very least, Plaintiff qualifies as a consumer that engaged in a consumer transaction for the purchase of a business opportunity as defined in Julian Ford</u> . . . In the alternative, Plaintiff bought a bottle of Pompeian for personal consumption or to test that bottle, which does not disqualify Plaintiff under . . . .. D.C. Code § 28-3901(a)(7).
> . . . .
> If there is a genuine dispute of material fact whether Defendant misrepresented and sold EVOO of Italian origin, the harm would not be self-inflicted upon Plaintiff's purchase of Pompeian; rather the

15

harm of an unlawful trade practice occurred once Defendant offered
to sell that bottle of Pompeian in its store."

*Id* at *7 (emphasis added, internal citations omitted).

37.    In short, § 3905(k)(1) makes it clear that the plaintiff may evaluate or test the

product in order to have standing as a tester-plaintiff, and reliance is not necessary.

38. An Affirmation of the undersigned describing the evaluation of the case, as required

by §3905(k) is set forth at the end of this complaint

## II.    The Deceptive Practices of the Defendant And Their Impact On Public Health

### A.    Introduction

39. .Nuture, Inc. manufactures one of the most recognizable brands of baby food products

in the United States. Through its brand described below, the Defendant has cultivated

an image with the public of producing high quality, nutritious, and safe products for

infants and toddlers, whose food intake is critical to their well-being and full

development.

40.  Defendants markets its baby food ("Baby Food" or "Products") [1]through the "Happy

Baby" Logo . It reassures parents of the safety of its products through the use of words

---

[1] The products at issue are various types of Nurtures baby food products that contain heavy metals, including but not limited to the Gerber product purchased by Mr. Nides and may include Nuture's other Baby Food Products, including but not limited to

and phrases in its marketing and advertising such as assuring parents on its website that:

| |
|---|
| Apple & Broccoli Puffs |
| Banana & Pumpkin Puffs |
| Strawberry & Beet Puffs |
| Kale & Spinach Puffs |
| Kale & Spinach Puffs |
| Purple Carrot & Blueberry Puffs |
| Sweet Potato & Carrot Puffs |
| Sweet Potato & Carrot Puffs |
| Apple Rice Cakes |
| Apple Rice Cakes |
| Sweet Potato & Carrot Puffs |
| Apple Rice Cakes |
| Blueberry Beet Rice Cakes |
| Purple Carrot & Blueberry Puffs |
| Apple & Broccoli Puffs |
| Strawberry & Beet Puffs |
| Purple Carrot & Blueberry Puffs |
| Apple Rice Cakes |
| Blueberry Beet Rice Cakes |
| Blueberry Beet Rice Cakes |
| Strawberry & Beet Puffs |
| Strawberry & Beet Puffs |
| Apple & Broccoli Puffs |
| Strawberry & Beet Puffs |
| Strawberry & Beet Puffs |
| Strawberry & Beet Puffs |
| Banana & Pumpkin Puffs |
| Sweet Potato & Carrot Puffs |
| Banana & Pumpkin Puffs |

> We're a family company, and only want to feed your little ones what we'd feed our own children. That's why we develop personal relationships with the farmers and partners we trust to make our products—so you can feel as good about nourishing your family as we do.

[2]

41. None of Defendant's Baby Food packaging discloses that it containes harmful levels of heavy metals and other ingredients. Stated otherwise, nowhere in the labeling, advertising, statements, warranties, or packaging does Defendant disclose that the Baby Foods include or have a high risk of containing dangerous levels of heavy metals or other ingredients that do not conform to the labels, packaging, advertising, and statements.

42. Instead, as shown in the examples below, Defendant's packaging and labels emphasize that HappyBABY Baby Food is organic, with the implicit assumption nothing artificial is added.[3]  By making these assurances that the Baby Foods are organic and safe for infant consumption, Defendant warrants, promises, represents, misleads, labels, and advertises that the Baby Foods are free of any heavy metals or unnatural ingredients.

43. Also as shown in the examples below, Defendant also warrants that its Baby Food is safe for babies and infants by making representations for which stage of infant development the Baby Food is appropriate for. For example, Defendant sets forth products, nutritionists and lactation consultants for "0-12 months"[4]

---

[2] https://www.happyfamilyorganics.com/
[3] *See* Figures 2 and 5, supra
[4] *https://www.happyfamilyorganics.com/*

44. But contrary to Defendant's glaring omissions and misleading claims, the Baby Foods have been shown to contain significant levels of arsenic, cadmium, lead, and/or mercury[5]—all known to pose health risks to humans and particularly infants.

45. For example, one of the  flavors purchased by Mr Nides , Apple and Broccoli Puffs was tested to have 160 parts per billion ("ppb") of arsenic, more  than 50% more than the "goal threshold" of 100 ppb .[6]

B.      Defendant Markets Its Baby Food as Safe and Reassures Parents that Its Products Are Healthy and Nutritious.

Tens of millions of parents entrust food manufacturers, including Nuture  inc, to provide their babies with much of the solid food they will eat during their first years of life. In 2018, more than 90 percent of parents with children three and under indicated in a survey that they purchase manufactured baby foods. Around 40 percent of these parents occasionally purchase organic food for their children, specifically to avoid lead, arsenic, and other heavy metals.

C.      Recent Testing by Independent Organizations Show the Defendant's Baby Foods Test For Hazardous Amounts of Heavy Metals

46.  In October 2017, a non-profit organization called Clean Label Project (a nonprofit focused on "bring[ing] truth and transparency to food and consumer product labeling"[7] released findings from a study showing contaminants such as arsenic, lead, and mercury in leading brands of infant formula and baby foods. Clean Label Project

---

[5] Healthy Babies Bright Futures, What's In My Baby's Food? (Oct. 2019), https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (hereinafter, "Healthy Babies Report") (last visited October 23rd 2021).
[6] SUBCOMMITTEE ON ECON. AND CONSUMER POLICY, COMM. ON OVERSIGHT AND REFORM, Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury (Feb. 4, 2021) (the "House Report") at 2.
[7] https://cleanlabelproject.org/about-us/ (last visited December 11, 2021).

purchased baby foods available in grocery stores across America and independently

tested them. The Clean Label Project report noted, *inte alia*, that, Defendant Nurture's

Happy Baby Organic Teethers Sweet Potato and Banana Gentle Teething Wafers were

identified as one of the bottom five snacks.[8]

47. Further, a 2018 Consumer Reports study (the "CR Study") cite indicated that products

with rice were particularly susceptible to dangerous heavy metal contamination.

48. In 2018, Consumer Report's food safety team analyzed 50 nationally distributed

packaged foods made for babies and toddlers, checking for cadmium, lead, mercury,

and inorganic arsenic, the type most harmful to health.[9] Those tests found that about

two-thirds (68 percent) had worrisome levels of at least one heavy metal. Fifteen of the

foods would pose potential health risks to a child regularly eating just one serving or

less per day. Snacks and products containing rice and/or sweet potatoes were

particularly likely to have high levels of heavy metals.[10]

49. Additionally, as a category, snack foods—bars, cookies, crackers, crunches, crisps,

puffs, and rice rusks and other teething biscuits—were the most problematic.

Consumer Reports noted that this was particularly concerning because "snacks are also

the most common type of packaged product that babies and toddlers eat, according to

---

[8] Infant Formula and Baby Food Project Summary, CLEAN LABEL PROJECT,
https://web.archive.org/web/20171027011929/http://www.cleanlabelproject.org/product-ratings/infant-formula-
baby-food/#top-ten (last visited December 13 2021).
[9] https://www.consumerreports.org/media-room/press-
releases/2018/08/consumer_reports_finds_concerning_presence_of_heavy_metals_in_baby_and_toddler_foods1/
(last visited December 14 2018) (The "CR Study").
[10] CR Renews call for FDA and manufacturers to take action, CONSUMER REPORTS (Feb. 4, 2021),
https://advocacy.consumerreports.org/press_release/cr-renews-call- for-fda-and-manufacturers-to-take-action-to-
keep-infants-and-children-safe-from- heavy-metals-in-foods/.

the CR survey. Seventy-two percent of parents said they feed their child at least one of the types of snack foods we tested."[11]

D.    *Healthy Babies Bright Futures Finds Heavy Metals in the Defendant's Baby Foods*

50. Following up, in October 2019, Healthy Baby Bright Futures tested various of the Defendant's baby food products.[12]

51. The Healthy Babies Study found that the samples contained heavy metals, including arsenic, lead, mercury, and cadmium.

52. . The researchers who published the Healthy Babies Study on explained the harms these metals and can cause. They explained that arsenic, lead, mercury, and cadmium, four heavy metals found in the Baby Foods, are neurotoxins. Exposures to these four heavy metals "diminish quality of life, reduce academic achievement, and disturb behavior, with profound consequences for the welfare and productivity of entire societies."[13]  The four  heavy metals "can harm a baby's developing brain and nervous system" and cause negative impacts such as "the permanent loss of intellectual capacity and behavioral problems like attention-deficit hyperactivity disorder (ADHD)."[14] Even trace amounts of these heavy metals can alter the developing brain and erode a child's IQ.[15]  Arsenic causes potentially irreversible damage, including "cognitive deficits among school-age children exposed early in life, and neurological problems in adults who were exposed to arsenic-poisoned milk as infants."[16]

---

[11] *Id.*
[12] Healthy Babies Bright Futures, What's In My Baby's Food? (Oct. 2019), https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf (hereinafter the "Healthy Babies Study").
[13] Healthy Babies Study at 13.
[14] Id. at 6.
[15] Id. at 1.
[16] Id. at 13.

According to the Healthy Babies Studies, research continues to confirm that exposure to food containing arsenic, lead, mercury, and cadmium poses "troubling risks for babies, including cancer and lifelong deficits in intelligence[.]"[17]  Most relevant for the instant case, Defendant Nurture's  snacks puffs tested at greater than the following: 80ppb arsenic, 5 ppb lead, 10ppb cadmium,  and  2ppb mercury

E.      A Recent Congressional Report Also Finds Harmful Heavy Metals in HappyBaby Baby Foods

53. A February 2021 congressional report from the Subcommittee on Economic and Consumer Policy of the House Oversight Committee found that Gerber Baby Food Products "contain significant levels of toxic heavy metals, including arsenic, lead, cadmium and mercury, which can endanger infant neurological development."[18]

54. The Subcommittee requested documentation from the largest baby food manufacturers in the United States, and the companies that responded (including Defendant) produced their internal testing policies, test results for ingredients/finished products (if the company tested its finished products), and documentation about what the companies did with the ingredients and/or finished products that exceeded their internal testing limits.[19]

55. Specifically, the Subcommittee found that Nuture sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic. Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic.

---

[17] Id.
[18] House Report at 2.
[19] House Report at 2.

Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic.[20]

56. The Food and Drug Administration (FDA), however, has set the maximum allowable levels in bottled water at 10 ppb inorganic arsenic."[21]

57. The Subcommittee also found that sixty-five percent of Nurture finished baby food products contained more than 5 ppb cadmium; and Nurture sold multi-grain cereal with 49 ppb cadmium. Nurture sold another 125 products that tested over 5 ppb, which is the EPA's limit for drinking water.

58. Finally, the Subcommittee determined that Nurture sold finished baby food products containing as much as 10 ppb mercury whereas the Environmental Protection Agency (EPA) has capped the allowable level of mercury in drinking water at 2 ppb.

59. Nurture sold its products for a profit, irrespective of potential health implications.

60. In fact, Nurture sold all products tested, regardless of how much toxic heavy metal the baby food contained. [22]

61. By company policy, Nurture's toxic heavy metal testing is not intended for consumer safety. The FDA has only finalized one standard—l00 ppb inorganic arsenic in infant rice cereal—and Nurture set its internal standard for that product 15% higher than the FDA limit, at 115 ppb."[23]

---

[20] *Id.*
[21] *Id.* at 4.
[22] Id.
[23] *Id.* at 4.

1.      The Dangers of the Heavy Metals in HappyBaby Baby Food Are Well-Documented

The findings by the Congressional Subcommittee and Happy Babies Bright Futures are particularly alarming because the Food and Drug Administration ("FDA") and the World Health Organization have declared arsenic, lead, cadmium, and mercury "dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects." [24]

The Department of Health and Human Services' Agency for Toxic Substances and Disease Registry, the U.S. Food and Drug Administration (the "FDA"), and the World Health Organization (the "WHO") have declared heavy metals, such as arsenic, lead, cadmium, and mercury, to be dangerous to human health. Exposure to these four neurotoxins diminishes quality of life, reduces academic achievement, and disturbs behavior, with profound consequences for the welfare and productivity of entire societies.

Babies and toddlers are particularly vulnerable to higher levels of toxins in their food due to their smaller size and developing brains and organ systems. Toxic heavy metals have a disproportionate adverse effect on the developing minds and bodies of babies and young children.

Exposure to even small amounts of toxic heavy metals at an early age may increase the risk of harm to the developing infant mind, brain, cardiovascular system, and immune system. It can also lead to lower IQ or behavioral disorders like attention deficit hyperactivity disorder ("ADHD"). Because toxic heavy metals can remain in the body for years, consumption of even small amounts over time can also increase the risk of bladder, lung, and skin cancer, and Type 2 Diabetes, among other conditions.

---

[24]House Report at 2.

Medical professionals and scientists agree that the effects of early exposure to toxic heavy metals may be impossible to reverse. For example, researchers at Duke University studied 565 adults who had their lead levels measured as children; those with high childhood exposure had IQ levels 4.25 points lower, on average, than those with lower childhood lead levels

a)    Arsenic

The Congressional Subcommittee found that  Nurture (HappyBABY) sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic.  Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic.."[25]   The U.S Environmental Protection Agency and the FDA have documented the risks associated with exposure to arsenic and regulated its amount in water, juice, and in rice cereals for infants. Specifically, based on the risks associated with exposure to arsenic, the EPA and the FDA have set standards for the allowable limit of arsenic at 10 parts per billion ("ppb") in drinking water, [26]bottled water,[27] and apple juice[28] intended for human consumption. The FDA has also set the action level for inorganic arsenic in rice cereals for infants to 100 ppb.[29]. Defendant uses ingredients that exceed these amounts.

b)    Lead .

The Congressional Subcommittee also found that the Baby Foods may contain lead, a known neurotoxin and human carcinogen.

---

[25] House Report at 3.
[26] 40 C.F.R. § 141.62 (2021).
[27] 21 C.F.R. § (2021).
[28] U.S. FOOD & DRUG ADMIN., Draft Guidance for Industry, Arsenic in Apple Juice: Action Level (July 2013), https://www.fda.gov/media/86110/download.
[29] U.S. FOOD & DRUG ADMIN., Inorganic Arsenic in Rice Cereals for Infants: Action Level Guidance for Industry (Aug. 2020),

Further, that Nurture (HappyBABY) sold finished baby food products that tested as high as 641 ppb lead.  Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead.[30]

Lead exposure can seriously harm children's nervous systems and developing brains and is associated with a range of negative health outcomes including "behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth."[31]

Because lead can accumulate in the body, even very low levels of exposure can become hazardous over time.[32] Indeed, "[n]o safe level of exposure has been identified."[33]

Studies have demonstrated that childhood exposure to lead is strongly linked to an adverse effect on academic achievement.[34] One study found that "children age 0 to 24 months lose more than 11 million IQ points from exposure to arsenic and lead in food." A correlation has also been established between lead exposure and Attention Deficit Hyperactivity Disorder.[35] Troublingly, the cognitive effects caused by early childhood exposure to lead appear to be permanent.[36]

Although there is no federal standard for lead in baby food, experts, including the American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports,

---

[30] *Id* at 3.
[31] House Report at 11 (citing U.S. FOOD & DRUG ADMIN., Lead in Food, Foodwares, and Dietary Supplements, https://www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary- supplements (last visited Feb. 17, 2021)).
[32] Id.
[33] Healthy Babies Study at 13.
[34] House Report at 11.
[35] Id.at 12 (citing Gabriele Donzelli et al., "The Association Between Lead and Attention-Deficit/Hyperactivity Disorder: A Systematic Review," INT'L J. ENVTL. RES. & PUB. HEALTH (Jan. 29, 2019), www.mdpi.com/1660-4601/16/3/382/htm).
[36] Id. at 11.

agree that lead in baby foods should not exceed 1 ppb.[37] The FDA has set the maximum lead level in bottled water to 5 ppb.[38]

> c)        Mercury

The Baby Foods also may contain mercury,[39] which increases the risk for cardiovascular disease and can cause vision, intelligence, and memory problems for children exposed in utero. Exposure to mercury has been linked to higher risk of lower IQ scores and intellectual disability.[40]

Recognizing the harm caused by ingestion of mercury, EPA has set the maximum mercury level in drinking water to 2 ppb.[41]

Defendant "sold finished baby food products containing as much as 10 ppb mercury.."[42]

> d)        Cadmium

The Baby Foods may also contain cadmium,[43] which has been observed to cause anemia, liver disease, and nerve or brain damage in animals that consume it.

Sixty-five percent of Nurture (HappyBABY) finished baby food products contained more than 5 ppb cadmium.[44]

Cadmium is linked to neurotoxicity, cancer, and kidney, bone, and heart damage.[45]

---

[37] House Report at 27.
[38] Healthy Babies Study at 16. 2821 C.F.R. § 165.110(b)(4)(iii)(A) (2021).
[39] See House Report at 33 (noting that Beech-Nut cite does not test its ingredients or finished products for mercury); Healthy Babies Study at 19-28 (independent test results showing that Beech-Nut cite products contain some levels of mercury).
[40] Healthy Babies Study at 14.
[41] 40 C.F.R. § 141.62(b).
[42] House Report at 4.
[43] Id at 37.
[44] Id. at 4.
[45] Healthy Babies Bright Futures Study at 14..

Scientists have reported a "tripling of risk for learning disabilities and special education among children with higher cadmium exposures, at levels common among U.S. children[.]"[46] Cadmium also "displays a troubling ability to cause harm at low levels of exposure."[47] The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen.[48]

The EPA and FDA have set the standards for the allowable limit of cadmium in drinking water[49] and bottled water[50] at 5 ppb. The WHO has established a maximum amount of cadmium in drinking water at 3 ppb.[51]

Defendant set an internal specification limit of 3,000 ppb for cadmium in certain ingredients, surpassing any existing regulatory standard.[52]

The Subcommittee on Economic and Consumer Policy concluded that Defendant used "105 ingredients that tested over 20 ppb cadmium" in its products, with some testing up to47 344.55 ppb cadmium.[53]

Additionally, Defendant sold eleven products surpassing its own internal cadmium limits.[54]

---

[46] Id.
[47] Healthy Babies Bright Futures Report at 14.
[48] ATSDR, DEP'T OF HEALTH AND HUMAN SERV., Public Health Statement: Cadmium (Sept. 2012), https://www.atsdr.cdc.gov/toxprofiles/tp5-c1-b.pdf. (last visited October 26, 2021)
[49] 40 C.F.R. § 141.62(b).
[50] 21 C.F.R. § 165.110(b)(4)(iii)(A).
[51] WORLD HEALTH ORGANIZATION, Cadmium in Drinking Water (2011), https://www.who.int/water_sanitation_health/water-quality/guidelines/chemicals/cadmium-fs-new.pdf.
[52]  House Report at 38.
[53] Id. at 3.
[54] Id. at 38.

### III.   The Conspiracy Among The Major Baby Food Manufacturers (the "Manufacturer-Conspirators")[55] To Downplay The Dangers of Heavy Metals In Their Products

62. In response to the above findings, and using the playbook of Big Tobacco in the 80s and 90s, described in more detail *infra*, the Manufacturer-Conspirators rushed to create a "trade organization" named the "Baby Food Council" (the "Council").  While creating a seemingly independent and pro-consumer entity that suggested they were actually committed to stopping a problem, in fact the Council was a device to assist the very fraud they were directing and perpetrating.

63. The Council was created in January 2019 only after congressional investigations began. It was put together quickly as a front organization by Manufacturer Defendants to mislead and deflect attention away from their ongoing fraud.

64. 'This deceptive maneuver was borrowed directly from the playbook of Big Tobacco, which decades earlier had employed public relations experts, lawyers, and lobbyists who worked to deceive the American public regarding the dangers of smoking.

65. In December 1953, the CEOs of the major tobacco companies met secretly in New York City. Their purpose was to counter the damage from studies linking smoking to lung cancer. A year earlier Reader's Digest—then the public's leading source of medical information—had printed an article entitled "Cancer by the Carton" (Norr 1952). After it appeared, cigarette sales plummeted for two years, the first such decline of the century except during the Great Depression. Working closely with John Hill, the founder of the public relations giant Hill & Knowlton, the industry created "A Frank

---

[55] The major baby food manufacturers are: Beech-Nut, Campbell, Hain, Gerber, and Defendant's brand, Happy Family Organics

Statement to Cigarette Smokers" and paid to have it published in 448 newspapers on January 4, 1954. To give the industry a human face, the statement included the signatures of the nation's top tobacco executives and assured Americans that "we accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business." Furthermore, they promised that "we always have and always will cooperate closely with those whose task it is to safeguard the public's health" (Tobacco Industry Research Committee 1954). The "Frank Statement" was a charade, the first step in a concerted, half-century-long campaign to mislead Americans about the catastrophic effects of smoking and to avoid public policy that might damage sales. Unearthed later, industry documents showed the repeated duplicity of its executives. Everything was at stake. The industry wanted desperately to prevent, or at least delay, shifts in public opinion that would permit a barrage of legislative, regulatory, and legal actions that would erode sales and profits.56[56]

66. Tobacco executives deliberately engineered deception using a pro- consumer front group as a form of misdirection and concealment; they would give money to seemingly independent universities so they could control the research and, more important, any results that were released. Big Tobacco realized that the "best public relations approach was for the industry to become a major sponsor of medical research. This tactic offered several essential advantages. The call for new research implied that existing studies were inadequate or flawed. It made clear that there was

---

[56]Kelly D. Brownell & Kenneth E. Warner, The Perils of Ignoring History: Big Tobacco Played Dirty and Millions Died. How Similar Is Big Food?, MILBANK QUARTERLY (Mar. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2879177/. _____

more to know, and it made the industry seem a committed participant in the scientific enterprise rather than a self-interested critic."[57]

67. Tobacco executives deliberately engineered deception using a pro- consumer front group as a form of misdirection and concealment; they would give money to seemingly independent universities so they could control the research and, more important, any results that were released. Big Tobacco realized that the "best public relations approach was for the industry to become a major sponsor of medical research. This tactic offered several essential advantages. The call for new research implied that existing studies were inadequate or flawed. It made clear that there was more to know, and it made the industry seem a committed participant in the scientific enterprise rather than a self-interested critic."57[58]

68. In other words, Big Tobacco created "a research program that would be controlled by the industry yet promoted as independent. This was a public relations masterstroke. Big Tobacco executives understood that simply giving money to scientists—through the National Institutes of Health or some other entity, for example—offered little opportunity to shape the public relations environment. However, offering funds directly to university-based scientists would enlist their support and dependence. Moreover, it would have the added benefit of making academic institutions 'partners' with the tobacco industry in its moment of crisis."[59]

---

[57]Allan Brandt, Inventing Conflicts of Interest: A History of Tobacco Industry Tactics, AM. J. PUBLIC HEALTH (Jan. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3490543/. 58 Id. (emphasis added).

[58]Id.
[59]Id. (emphasis added).

69. . In other words, Big Tobacco created "a research program that would be controlled by
the industry yet promoted as independent. This was a public relations masterstroke.
Big Tobacco executives understood that simply giving money to scientists—through
the National Institutes of Health or some other entity, for example—offered little
opportunity to shape the public relations environment. However, offering funds
directly to university-based scientists would enlist their support and dependence.
Moreover, it would have the added benefit of making academic institutions 'partners'
with the tobacco industry in its moment of crisis."58 find cite for this

70. The food industry has already been exposed for following the Big Tobacco playbook:
The tobacco team had a playbook—a master plan and script that directed the behavior
of industry executives, lobbyists, lawyers, scientists, and government officials friendly
to the industry. In A Question of Intent, a former FDA commissioner, David Kessler
(2001, p. xiii), wrote:

Devised in the 1950s and '60s, the tobacco industry's strategy was
embodied in a script written by the lawyers.

Every tobacco company executive in the public eye was
told to learn the script backwards and forwards, no
deviation was allowed. The basic premise was simple—
smoking had not been proved to cause cancer. Not
proven, not proven, not proven—this would be stated
insistently and repeatedly. Inject a thin wedge of doubt,
create controversy, never deviate from the prepared line.
It was a simple plan and it worked.

71. The food industry appears to have a strategy as well, repeatedly carried to the public
by spokespersons from food companies, trade associations, and their political allies.[60]

---

[60] Kelly D. Brownell & Kenneth E. Warner, "The Perils of Ignoring History: Big Tobacco Played Dirty and Millions
Died. How Similar Is Big Food?", MILBANK QUARTERLY (Mar. 2009),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2879177/ (emphasis added) at 60

72. The baby food industry has taken these same techniques, proven to work by Big Tobacco and already used by the overall food industry to beat back proof that bad foods cause obesity, and applied them to baby food manufacturing, sales, and marketing.

73. . Big Tobacco was stopped only by a civil RICO claim that broke apart the corrupt, coordinated corporate behavior that centered on fraudulent sales, marketing, and advertising of tobacco products to American purchasers. In an August 2006 judgment, a federal court ruled that several tobacco companies "systematically defrauded the American people by lying for decades about, among other things, the health effects of smoking and their marketing to children."[61]

74. The Co-Conspirators are mimicking Big Tobacco through the establishment and use of the Council. The Council website hosted on the food science department of Cornell University claims: "the Baby Food Council is a group of infant and toddler food companies" (supported by other entities) that was "created in January 2019 is a group of infant and toddler food companies seeking to reduce heavy metals in the companies' products to as low as reasonably achievable using best-in-class management practices. ."[62]

---

Big Tobacco finally forced to tell the truth about its deadly products through court- ordered ads, TRUTH INITIATIVE (Nov. 27, 2017), https://truthinitiative.org/press/press- release/big-tobacco-finally-forced-tell-truth-about-its-deadly-products-through-court.
[61]Big Tobacco finally forced to tell the truth about its deadly products through court- ordered ads, TRUTH INITIATIVE (Nov. 27, 2017), https://truthinitiative.org/press/press- release/big-tobacco-finally-forced-tell-truth-about-its-deadly-products-through-court.
[62]https://www.foodclaimd.com/babyfoodstandard/

75. According to the Council charter from May 21, 2019, its members as of April 15, 2019, included Cornell University and Beech-Nut, Campbell, Hain, Gerber, and Defendant's brand, Happy Family Organics.[63]

76. Through the charter, these members agreed to "[t]reat the heavy metals as an unavoidable contaminant that should be manageable by admitting their presence, acknowledging no safe level in the food supply, and striving to drive the levels as low as reasonably achievable using best-in-class management practices."

77. The members also acknowledged that FDA had previously suggested not looking at one food at a time but looking at overall exposure based on a child's complete diet.

78. When the Council was formed, the Co-Conspirators stressed their involvement in a joint press release issued on October 17, 2019, through the Environmental Defense Fund.62[64]

79. Jason Jacobs, Vice President of Food Safety & Quality for Beech-Nut, stated:

> ""Being a dad, I understand the need for safe food. Beech-Nut cares deeply about the safety of all food – not just baby food and that's why we were a founding member of the Baby Food Council. We're committed to working together to bring sustainable change in this important environmental issue."

80. Annalisa Fornarelli, Vice President of Global Food Safety and Quality for Defendant Campbell, stated:

---

[63] A viewing of the site on November 27, 2021 indicates the present members are Earth's Best, Gerber, the Defendant, and Beech-Nut. *Id*
[64] Press Release, Baby Food Council, The Baby Food Council is taking on the challenge of reducing heavy metals in young kids' food (Oct. 17, 2019), https://www.edf.org/media/baby-food-council-taking-challenge-reducing-heavy-metals-young-kids-food. _____
A link to the "Baby Food Council" now produces https://cals.cornell.edu/food-science/industry-engagement/cornell-institute-food-systems/cifs-ipp, which makes no reference to the Baby Food Council. After some search, a "Baby Food Council" page on Cornell's site can be found: https://cals.cornell.edu/food-science/industry-engagement/other-industry-initiatives, and finally to https://www.foodchainid.com/babyfoodstandard/

> "Plum Organics is proud to be a member of the Baby Food Council. As part of the Council, we share the same overall goal of our industry partners, and that is to provide safe and high-quality products to babies and toddlers. Plum's mission is to provide all little ones with the very best food from the very first bite."[65]

81. Joel Lim, M.D., Medical Director for Gerber, stated: "Gerber has always put babies and toddlers first, but we never stop asking ourselves, 'Can we do more?' This question inspires our commitment to continuously raise our high standards and improve our methods to reduce and limit contaminants in all our foods. We're excited to be partnering with like-minded organizations who are also committed to improving the safety and quality of food for little ones."

82. Raul Fajardo, Senior Vice President of Technical Services for Hain, stated: "Although heavy metals are naturally occurring in the environment, we are always looking to reduce their presence in food. Earth's Best is excited to partner with the members of the Baby Food Council to support this important initiative."

83. E. Jason Rosecast, Vice President of Quality and Food Safety for Defendant Nurture, stated:

> "At Happy Family Organics, our mission is, and always has been, to change the trajectory of children's health through nutrition. Being a founding member of and contributor to the Baby Food Council reinforces our commitment to create the best possible foundation for young children to realize their potential to lead a happy and healthy life. This is a great challenge in which many stakeholders across our industry need to work together, and we all share in the responsibility to do so."

84. . Including Cornell University as a member (and having it host the website) is directly in line with Big Tobacco by using university-based scientists and partnering with academic institutions to further the Co-Conspirators' schemes. Further, there is good

---

[65] Prior to 2021, Defendant Campbell left the Baby Food Council for unexplained reasons.

reason to infer that the baby food industry is paying significant money to either

Cornell University's food science department and/or the professors at Cornell who are

running the Council.

85. According to its website:

> Created in January 2019, the Baby Food Council ℠ is a group of infant and toddler food companies seeking to reduce heavy metals in the companies' products to as low as reasonably achievable using best-in-class management practices.

> In 2020, the Baby Food Council completed a lab proficiency study leading to identification of labs capable of accurately and consistently detecting low levels of heavy metals in pureed baby foods. This study will allow for data to be analyzed across multiple labs for purposes of establishing a baseline for heavy metals in fruits and vegetables and measuring improvement over time.

> In July 2020, the Baby Food Council resolved to establish a Baby Food Standard and Certification Program to incentivize the reduction of heavy metals in baby food products to as low as reasonably achievable while preserving and/or not having any adverse impact on beneficial nutrients. The Standard would have provided companies with a common framework for progressively reducing contaminants by regularly testing products and improving management practices, and for being transparent with consumers about the safety of their products.

> Work on the Standard has recently stopped. Considerations to resume work are underway. Please watch this space for further developments.

86. Despite being involved in the Council, the Defendant-Conspirators knowingly violated

several of the stated tenets of the Council and took positions contradicted by it.

a. First, the Council affirmatively stated that any exposure to contaminated foods is

unacceptable because "there is no known safe level of exposure" for babies:[66]

---

[66] https://www.foodchainid.com/babyfoodstandard/labprocess/ (last visted November 26th 2021).

36

> **Analysis of Baby Food Products for Heavy Metals**
>
> A best practice to reduce heavy metals in vegetable and fruit purees is to regularly test ingredients and products for low levels of arsenic, cadmium, and lead to be able to identify and resolve potential problems. Accordingly, the FDA and food industry regularly test foods for various heavy metals, including arsenic, cadmium, and lead. These common food contaminants occur naturally or from pollution in the environment. Organic and conventional crops alike absorb them from soil and water. Their presence in baby food raises is a concern because babies are more sensitive to their harmful impacts. There is no known safe level of exposure to these metals; hence even low levels of contamination are a concern.

87. Second, the website referred to proper procedures for testing for "arsenic, cadmium, and lead"—yet the Manufacturer-Conspirators did not follow these guidelines when knowingly manufacturing products with contaminants.

88. Because of their financial contributions, the Manufacturer-Conspirators were able to influence the content of the Council's website, however, in at least two ways:

   a.   First, the Council website falsely states that "contaminants naturally occur"—an obviously false statement that was included to mislead purchasers into believing the contamination in their food cannot be mitigated when in fact it can. Indeed, "[t]oxic metals might be more common in baby foods because of the vitamins and minerals added to those foods during processing," according to Michael Hansen, senior staff scientist at Consumer Reports.

   a.   Second, the website ignores mercury as a dangerous heavy metal that is included in baby food as a contaminant. The Council website speaks only to arsenic, cadmium, and lead—it leaves out mercury entirely, even though mercury is a well-known toxin.

89. . If it was not created by Manufacturer-Conspirators as a vessel for fraud, the Baby Food Council appears to have been infiltrated and taken over by them. Several factors suggest this has occurred.

90. First, despite being formed in January 2019, the Council has taken no meaningful steps toward solving the issue of heavy metals in baby food. Further, the Council cannot point to any activity it has taken that is contrary to the corporate interests of its members.

91. Second, if the Council were legitimately concerned with baby food, it would have, at a minimum, commented upon the practices of the Co-Conspirators following the release of the February 2021 congressional study cite what is the term of art for this. Or, at the very least, it would have issued some statement regarding this bombshell, front page national news event. But the Council, as of March 11, 2021, has said nothing about these recent congressional findings.

92. Third, its website is hosted by the Food Science Department of Cornell University, which is odd because Cornell is merely a member of the Council and does not own or operate the entity on its own. Further discovery is needed for Plaintiff to uncover the financial payments made by the Co-Conspirators to Cornell and its faculty and any other connections between the Manufacturer-Conspirators and Cornell and its food science department, including the professor listed on the Baby Food Council webpage (Professor Rui Hai Liu).

93. Fourth, the Council has virtually no online presence. Its members frequently tout their membership as a defense to the fact they are engaging in food fraud, but the Council does nothing. It issues no press releases, no guidance, no newsletter, no updates, no safety alerts—nothing.  As it candidly admits

Work on the Standard has recently stopped. Considerations to resume work are underway. Please watch this space for further developments.

94. . Fifth, the Council waited 10 months (from January to October 2019) before doing or saying anything, and that occurred only because it knew that its food manufacturer members were about to be hammered for major food fraud violations:

> October 17, 2019
>
> **FOR IMMEDIATE RELEASE**
>
> (Washington, D.C. – October 17, 2019) Today, the Baby Food Council, a broad-based group of companies and other organizations formed in January 2019, announced its efforts to take on the challenge of reducing heavy metals in young children's food. This news comes as Healthy Babies Bright Futures (HBBF), a children's health advocacy group and member of the Council, released a new report demonstrating that tests on over 160 foods consumed by babies and toddlers found that 95% of the products tested had detectable levels of heavy metals. Recognizing that heavy metals are widely present in the environment and can get into food, the Council seeks to reduce levels of heavy metals in food products to as low as reasonably achievable using best-in-class management techniques.

95. This press release directly connects the Council's activity to the incriminating Healthy Baby Study that was about to be issued. Had the Healthy Baby Study not been released, the Council would have taken no action. And even then, from October 2019 to present, nothing has changed. Neither the Council nor any of the Manufacturer - Conspirators have alerted purchasers that their food is contaminated, nor have they corrected their false advertising, recalled any of their defective products, or disproven the allegations that they are engaging in food fraud.

96. This 2019 release was not news to Defendants or the Council. At least by 2018, per the CR Study, cited on page 20 *supra*, Defendants and the Council knew there was a systemic problem of contamination with baby food.

97. Throughout this time, Defendant continued to falsely reassure consumers that its products were healthy, safe, pure, and natural

98. . Despite knowing their products posed a significant risk to the developing minds and bodies of babies and young children, Defendant continued to warrant, promise, represent, mislead, label, and/or advertise that its baby food products were free of any heavy metals, and/or unnatural ingredients by making assurances that the foods are natural, pure, healthy, and safe for infant consumption

IV.    The Reliance of the General Public On The Representation of the Defendant

99. Despite the known risks of exposure to these heavy metals, Defendant has negligently, recklessly, and/or knowingly sold the Baby Foods without disclosing they may contain arsenic, mercury, cadmium, and lead to consumers such as the DC General Public.

100.    Given the well documented dangers of the heavy metals that may be in the Baby Foods, reasonable consumers, like the DC General Public, would consider the mere presence or risk of heavy metals as a material fact in considering what baby food products to purchase.

101.    Defendant knew or should have known that the Baby Foods contained or had a risk of containing dangerous levels of heavy metals. Additionally, Defendant knew or should have known that its ingredients, and the final products, could contain materials such as toxins and heavy metals. Yet, Defendant did not test all ingredients and finished products, including the Baby Foods, for such materials.

102.    Additionally, Defendant knew or should have known that consumers such as the DC General Public would feed the Baby Foods multiple times each day to their

children, making it the primary source of food for their children. This necessarily leads to repeated exposure of heavy metals to the child.

103.    Defendant knew or should have expected that the presence or risk of heavy metals in its Baby Foods is a fact that the reasonable consumer would consider when purchasing baby food.

104.    As a result of these false or misleading statements and omissions, Defendant has generated substantial sales of the Baby Foods.

105.    Plaintiff brings this action individually and on behalf those members of the DC General Public who purchased the Baby Foods, in order to cause the disclosure of the presence or risk of heavy metals that pose a known risk to infants in the Baby Foods, to correct the false and misleading perception Defendant has created in the minds of consumers that the Baby Foods are high quality, safe, and healthy, and to obtain redress for those who have purchased the Baby Foods.

106.    The Defendant has violated and continues to violate the CPPA through its misrepresentations and omissions relating to:

• The safety of its baby food products;
• The presence and danger of unacceptably-high levels of toxic heavy metals in its products;
• Its failure to test its finished baby food products for levels of toxic heavy metals instead of testing only individual product ingredients;
• Its failure to test some of its ingredients and finished products for certain toxic heavy metals such as mercury; and
• Its establishment of the highest internal toxic heavy metal standards in the industry and its failure to abide by those excessively-high toxic heavy metal standards in the production and sale of its baby food products.

**Count 1**
**Violation of the CPPA**
**Implied and Express Warranties**
**Section 3904(x)**

41

107.     Plaintiff incorporates the allegations of paragraphs 1 through  0 as though fully set

forth herein, and alleges further:

108.     As noted above, the CPPA, §28-3904, provides that is it a violation  "whether or

not any consumer is in fact mislead, deceived or damaged thereby" for any person to ,

inter alia, "sell consumer goods in a condition or manner not consistent with state or

federal law."

109.     Section 313 of the D.C. UCC (DC Code § 28:313 provides:

(1) Express warranties by the seller are created as follows:

(a)  Any affirmation of fact or promise made by the seller to the buyer which relates to the
goods and become part of the basis of the bargain creates an express warranty that the
goods shall conform the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an
express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express
warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal
words such as "warrant" or "guarantee" or that he have a specific intention to make a
warranty, but an affirmation merely of the value of the goods or a statement purporting to
be merely the seller's opinion or commendation does not create a warranty.

D.C. Code § 28-314 provides:

(a) Unless excluded or modified . . . a warranty that the goods shall be
merchantable is implied in a contract for their sale if the seller is a
merchant with respect to goods of that kind.  Under this section, the serving
for value of food or drink to be consumers either on the premises or
elsewhere is a sale.

(b) Goods to be merchantable must be at least such as . . .

( i ) In the case of fungible goods, are of fair average quality within the
description; and

(ii) Are fit for the ordinary purposes for which such goods are used; and

(iii) Are adequately contained, packaged, and labeled as the agreement may
require; and

(iv) Conform to the promises or affirmations of fact made on the container or label, if any.

110.    Plaintiff and DC consumers have purchased the Products from the Defendant. The above-referenced warranties apply to the Products.  The Defendant has failed to honor these warranties.

111.    The Products are not merchantable because they do not conform to the promises or affirmations covered.

112.    §28:2-607 (3) (A) requires that a buyer must within a "reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy;"  Plaintiff's counsel, on behalf of him and the DC Public, have given such notice.

113.    Defendant's breaches of its Express Warranties and the Implied Warranty of Merchantability, and its sale of consumer goods in a condition and in a manner inconsistent with D.C. law and contrary to the operation and requirements of federal law constitute unlawful trade practices, which violate the rights of the Plaintiff and the DC General Public as protected by the CPPA.  D.C. Code § 28-3904(x).

**Count 2 –
Violations of the CPPA –
Various subsections**

114.    Plaintiff incorporate the allegations of paragraphs 1 through  0 as though fully set forth herein, and alleges further: By marketing the Products in the manner described above, the Defendant violated various provisions of Section 3904 of the CPPA, especially(e), (f) and (x).

115.    Such violations are actionable under the CPPA, and make the relief requested below appropriate.

## V.   PRAYER FOR RELIEF

WHEREFORE, as to Count I and II of the Complaint, Plaintiff, on behalf of the general

public of the District of Columbia, asks this court to award:

statutory or actual damages, trebled, for Plaintiff, except Mr. Nides disclaims any
damages in excess of $74,000;

attorneys' fees; and

an injunction against the Defendant's' violations of the CPPA; and

any other relief this court deems just and proper.

Respectfully Submitted

*Thomas C. Willcox*
Thomas C. Willcox, Attorney at Law
DC Bar No 445135
1701 16th Street, N.W
Suite 211
Washington DC   20009
Tel: 202.338.0818
T.C. 202.234.0892
thomaswillcox@willcoxlaw.com.co

DISTRICT OF COLUMBIA SUPERIOR COURT
Civil Division

Jim Nides                                                        Jury Trial Demanded
1701 16th Street, NW
Apt 522
Washington, DC.   20009
Representative Plaintiff
On Behalf of the DC General Public

v.
Nurture, Inc.
1 Maple Avenue,
White Plains, New York.

   Defendant

1.   I, Thomas C Willcox, pursuant 28 USC § 1746 and the unsworn penalties of perjury ,

     and to the best of my  knowledge and belief, affirm the following:

2.   I am a Member of the District of Columbia and New York Bars.

3.   I have read and evaluated the materials supporting the Complaint including the "House

     Report" and the "Healthy Babies Bright Future Report" both defined and discussed in

     the Complaint.

4.   On the basis of this review, and other materials cited in the complaint, my evaluation

     of the above complaint is that it not only states a viable cause of action, but that the

     Plaintiff will ultimately prevail at trial.


Dated : March 8, 2022